THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- x

BURGER'S BAR I.I.D.,                              :        ECF CASE
                                                 :
                    Plaintiff,                    :        Index No.: 09 civ 00766 (DAB)
                                                 :
        -against-                                 :        **FIRST AMENDED**
                                                 :        **THIRD-PARTY COMPLAINT**
BURGERS BAR FIVE TOWNS LLC and                   :
MITCHELL KREVAT                                   :
                                                 :        (JURY TRIAL DEMANDED)
                    Defendants.                   :
------------------------------------------------------------- x

BURGERS BAR FIVE TOWNS LLC and                   :
MITCHELL KREVAT,                                  :
                                                 :
                    Third-Party Plaintiffs,       :
                                                 :
        -against-                                 :
                                                 :
BURGER HOLDINGS CORP. a/k/a BURGERS              :
HOLDING INC. and ELDAD ELLA,                      :
                                                 :
                    Third-Party Defendants.       :
                                                 :
------------------------------------------------------------- x

        Defendants/Third-Party Plaintiffs Burgers Bar Five Towns LLC ("Five Towns") and

Mitchell Krevat ("Mr. Krevat") (collectively, the "Third-Party Plaintiffs") by their undersigned

attorneys, Tashjian & Padian, as and for their First Amended Third-Party Complaint against

Third-Party Defendants Burger Holdings Corp. a/k/a Burgers Holding Inc. ("Burger Holdings")

and Eldad Ella ("Mr. Ella") (collectively, the "Third-Party Defendants") herein, allege as

follows:

THE PARTIES

        1.      Third-Party Plaintiff Five Towns is a limited liability company organized under

the laws of the State of New York with a place of business in Cedarhurst, New York.  Plaintiff

Five Towns owns and operates a kosher restaurant in Cedarhurst which primarily sells beef burgers under the name Burgers Bar.

2.    Third-Party Plaintiff Mitchell Krevat is a citizen and resident of the State of New York. Mitchell is the president and a member of Five Towns.

3.    Upon information and belief, Third-Party Defendant Burger Holdings is a corporation organized under the laws of the State of New York with a place of business in Brooklyn, New York.  Burger Holdings owns and operates a kosher restaurant in Brooklyn also operating under the name Burgers Bar.

4.    Third-Party Defendant Eldad Ella is a citizen of Israel who resides in New York and is the president and principal shareholder of Burger Holdings.

JURISDICTION

5.    Personal jurisdiction is proper over the Third-Party Defendants pursuant to Fed. R. Civ. P. Rule 4(k)(1) and N.Y. C.P.L.R. § 301.

6.    The Court has jurisdiction over this matter pursuant to the principles of supplemental jurisdiction, 28 U.S.C. § 1367(a).

7.    The claims set forth against the Third-Party Defendants herein arise out of  and are part of the same transaction or occurrences as alleged in the January 27, 2009 Complaint (the "Complaint") of Plaintiff Burger's Bar I.I.D. ("Plaintiff") in the above-captioned first-party action, as well as the transaction or occurrences as alleged in a July 2, 2009 Complaint filed by Plaintiff and Burger's Bar Hamoshava Ltd. against the Third-Party Plaintiffs and third-party defendant Mr. Ella in the District Court of Jerusalem, Israel, Civil Case No. 3251/09 (the "Israeli Action"), and the determination of Third-Party Plaintiffs' claims against the Third-Party Defendants in this proceeding is necessary and appropriate in order to avoid the multiplicity of

actions that will result if Third-Party Plaintiffs were required to defend Plaintiff's claims, and then bring a separate action against Third-Party Defendants for, inter alia, indemnification of any sum or sums which Third-Party Plaintiffs may be compelled to pay as a result of any damages, judgment or other awards arising out of the transactions or occurrences which are the subject matter of this action or the Israeli Action.

FACTS

8.    On or about November 2005, Mr. Krevat was seeking to open up a kosher restaurant and met Mr. Ella, president of Burger Holdings.

9.    On or about November 2005, Burger Holdings was operating a kosher restaurant in Brooklyn using the name "Burgers Bar."

10.    At or about that time in November 2005, Mr. Ella represented to Mr. Krevat that the "Burgers Bar" restaurant being run by Mr. Ella was connected to, and authorized by, Plaintiff B.B. Israel.

11.    At or about that time in November 2005, Mr. Ella represented that he had the right to authorize third-parties such as Mr. Krevat to open up Burgers Bar restaurants in the U.S. and to license the intellectual property associated with the business.

12.    Thereafter, Mr. Krevat and Mr. Ella entered into negotiations concerning Mr. Krevat opening his own Burgers Bar in the town of Cedarhurst, New York.  During negotiations, Mr. Ella again assured Mr. Krevat that the "Burgers Bar" restaurant being run by Mr. Ella was connected to, and authorized by, Plaintiff B.B. Israel, and that he, Mr. Ella, had the right to authorize third-parties such as Mr. Krevat to open up Burgers Bar restaurants in the U.S. and to license the intellectual property associated with the business.

3

13.     Plaintiff has alleged in the Complaint that Mr. Ella did not have actual authority to grant permission to third-parties to open a "Burgers Bar" restaurant and to license the intellectual property, if any, associated with the business.

14.     If true, Mr. Ella's representations that he had the authority to grant permission to third-parties to open a "Burgers Bar" restaurant and to license the intellectual property associated with the business were false, and Mr. Ella knew such representations to be false when made.

15.     Mr. Ella's misrepresentations were material to Mr. Krevat's decision to do business with Mr. Ella and Burger Holdings, and Mr. Krevat reasonably relied upon Mr. Ella's misrepresentations.

16.     On August 11, 2006, Mr. Krevat caused Defendant Five Towns to be formed under the laws of the State of New York for the purposes of owning and operating a "Burgers Bar" restaurant in Cedarhurst, New York.

17.     In November 2006, Defendant Five Towns and Burger Holdings entered into a license agreement (the "License Agreement"), a copy of which is attached hereto as Exhibit A, which was signed by Mr. Ella on behalf of Burger Holdings.

18.     Pursuant to the License Agreement, Defendant Five Towns paid Burger Holdings for the right to use "the various trademarks and service marks employed in Burgers Bar Restaurants (referred to together as the 'Marks') and to use the recipes, procedures and other techniques involved in operating a Burgers Bar Restaurant (the 'Operating System')" "in direct connection with the sale of Kosher food, beverage and other products at the locations indentified and mutually agreed upon between [Burger Holdings] and [Five Towns] from time to time." See Exhibit A at p. 1.

4

19.    Pursuant to the License Agreement, Burger Holdings represented that it "has developed a distinctive concept and type of Kosher restaurant featuring American-style food, including Kosher gourmet hamburgers, and related items and beverages under the name 'BURGERS BAR' and that it "owns, and has all necessary rights to license to others to use" the Marks and Operating System.  See Exhibit A at p. 1.

20.    Pursuant to Section 11.1 of the License Agreement, Burger Holdings represented and warranted to Five Towns that Burger Holdings "has the sole and exclusive right to use the Marks in connection with the products and services to which they are or may be applied by [Five Towns] hereunder."

21.    Burger Holdings and Mr. Ella's warranties and representations in the License Agreement were material to Five Towns' decision to enter into the agreement, and Five Towns reasonably relied upon the warranties and representations made by Burger Holdings and Mr. Ella as set forth above.

22.    Based upon the License Agreement and the warranties and representations made by Burger Holdings and Mr. Ella, Five Towns began using the "B BUR GERS BAR" design and word mark, a copy of which is attached hereto as Exhibit B, in commerce in connection with its kosher restaurant in Cedarhurst, New York in or about the first half of 2007.

23.    Five Towns was the first to use the design and word mark "B BUR GERS BAR" in commerce in the United States.

24.    Based upon the License Agreement and the warranties and representations made by Burger Holdings and Mr. Ella, Five Towns began using the Operating System in commerce in connection with a kosher restaurant in Cedarhurst, New York in or about June 2007.

## AS AND FOR THE FIRST CLAIM FOR RELIEF
### (Breach of Contract)

25.    Third-Party Plaintiffs repeat and reallege paragraphs 1 through 24, supra, as if fully set forth herein.

26.    Plaintiff has alleged in the Complaint that Third-Party Plaintiffs have committed trademark infringement on the grounds that Mr. Ella and Burger Holdings did not have the right to license the Marks and Operating System to Five Towns.

27.    If true, Burger Holdings materially breached its express contractual warranties and representations made in the License Agreement concerning its authority to license the Marks and Operating System, including the mark "B BUR GERS BAR."

28.    As a result of Burger Holdings' alleged breach of contract, Five Towns has been damaged because (inter alia) it has expended substantial amounts of resources in developing the goodwill of the Marks and Operating System, has incurred the cost of defense and its own attorneys fees, and otherwise has been damaged in an amount to be proven at trial.

## AS AND FOR THE SECOND CLAIM FOR RELIEF
### (Fraudulent Misrepresentation)

29.    Third-Party Plaintiffs repeat and reallege paragraphs 1 through 28, supra, as if fully set forth herein.

30.    If, as Plaintiff alleges in the Complaint, Mr. Ella and Burger Holdings were not authorized to license the Marks and Operating System to Five Towns, then Mr. Ella and Burger Holdings misrepresented their authority to Five Towns and Mr. Krevat in breach of the warranties and representations set forth in the License Agreement and Five Towns and Mr. Krevat have been damaged in an amount to be proven at trial by their justifiable reliance upon these false representations and warranties.

6

## AS AND FOR THE THIRD CLAIM FOR RELIEF
(Breach of Contractual Indemnity)

31.    Third-Party Plaintiffs repeat and reallege paragraphs 1 through 30, supra, as if fully set forth herein.

32.    Third-Party Plaintiffs are in no way responsible for the acts alleged in the Complaint or any claims asserted by any person or entity arising out of any acts alleged in the Complaint.

33.    Upon information and belief, any alleged liability of Third-Party Plaintiffs, if established, would be a direct and proximate result of the conduct of Third-Party Defendants Burger Holdings and Mr. Ella.

34.    Pursuant to paragraph 9.2 of the License Agreement, Burger Holdings agreed to "indemnify, defend and hold [Five Towns] harmless from and against any and all claims based upon, arising out of or in any way related to...claims that the Marks or Operating System infringes, misappropriates or otherwise constitutes the unauthorized use of any third party patent, copyright, trademark, trade secret or other proprietary or intellectual property right."

35.    Pursuant to paragraph 9.2 of the License Agreement, Five Towns is entitled to indemnification from Burger Holdings for any sums paid as a result of any damages, judgments or other awards recovered against Five Towns, and for all other loss or damage that Five Towns may sustain because of any claims asserted against it herein, including costs and attorneys fees incurred or to be incurred, and any additional costs and expenses, including costs of investigation and attorneys fees.

36.    The exact amount of Five Towns' damages is not known at this time, and Five Towns seeks leave to set forth the full amount of damages pursuant to the pretrial procedures of this Court and the Federal Rules of Civil Procedure.

7

## AS AND FOR THE FOURTH CLAIM FOR RELIEF
(Breach of Contractual Indemnity)

37.    Third-Party Plaintiffs repeat and reallege paragraphs 1 through 36, supra, as if fully set forth herein.

38.    On or about July 2, 2009, Plaintiff and Burger's Bar Hamoshava Ltd. commenced the Israeli Action against the Third-Party Plaintiffs, asserting claims against the Third-Party Plaintiffs for, *inter alia*, tortious interference with contract, unfair interference, false description, injurious falsehood and breach of Israeli trademark law.

39.    Third-Party Plaintiffs are in no way responsible for the acts alleged in the Israeli Action or any claims asserted by any person or entity arising out of any acts alleged in the Israeli Action.

40.    Upon information and belief, any alleged liability of Third-Party Plaintiffs in the Israeli Action, if established, would be a direct and proximate result of the conduct of Third-Party Defendants Burger Holdings and Mr. Ella.

41.    In addition to the indemnification provision set forth in paragraph 9.2 of the License Agreement pursuant to which Burger Holdings agreed to indemnify Five Towns against claims for trademark infringement arising out of the use of the , pursuant to the same paragraph Burger Holdings also agreed to "indemnify, defend and hold [Five Towns] harmless from and against any and all claims based upon, arising out of or in any way related to…(ii) claims that the operation of any Restaurant breaches an express or implied contractual obligation owed by [Burger Holdings] to any BURGERS BAR licensee, franchisee, or developer" and "(iii) claims that the operation of any Restaurant constitutes tortious conduct against any such BURGERS BAR licensee, franchisee, or developer."

42.    Pursuant to paragraph 9.2 of the License Agreement, Five Towns is entitled to

indemnification from Burger Holdings for any sums paid as a result of any damages, judgments or other awards recovered against Five Towns, and for all other loss or damage that Five Towns may sustain because of any claims asserted against it in the Israeli Action, including costs and attorneys fees incurred or to be incurred, and any additional costs and expenses, including costs of investigation and attorneys fees.

43.     The exact amount of Five Towns' damages is not known at this time, and Five Towns seeks leave to set forth the full amount of damages pursuant to the pretrial procedures of this Court and the Federal Rules of Civil Procedure.

## AS AND FOR THE FIFTH CLAIM FOR RELIEF
(Equitable Indemnification)

44.     Third-Party Plaintiffs repeat and reallege paragraphs 1 through 43, supra, as if fully set forth herein.

45.     Third-Party Plaintiffs are entitled to indemnification from Third-Party Defendants for any sums paid as a result of any damages, judgments or other awards recovered against Third-Party Plaintiffs, and for all other loss or damage that Third-Party Plaintiffs may sustain because of any claims asserted against it herein, including costs and attorneys fees incurred or to be incurred, and any additional costs and expenses, including costs of investigation and attorneys fees.

46.     The exact amount of Third-Party Plaintiffs' damages is not known at this time, and Third-Party Plaintiffs s seeks leave to set forth the full amount of damages pursuant to the pretrial procedures of this Court and the Federal Rules of Civil Procedure.

## AS AND FOR THE SIXTH CLAIM FOR RELIEF
(Equitable Indemnification)

47.     Third-Party Plaintiffs repeat and reallege paragraphs 1 through 46, supra, as if fully set forth herein.

48.    Third-Party Plaintiffs are entitled to indemnification from Third-Party Defendants for any sums paid as a result of any damages, judgments or other awards recovered against Third-Party Plaintiffs, and for all other loss or damage that Third-Party Plaintiffs may sustain because of any claims asserted against it in the Israeli Action, including costs and attorneys fees incurred or to be incurred, and any additional costs and expenses, including costs of investigation and attorneys fees.

49.    The exact amount of Third-Party Plaintiffs' damages is not known at this time, and Third-Party Plaintiffs s seeks leave to set forth the full amount of damages pursuant to the pretrial procedures of this Court and the Federal Rules of Civil Procedure.

### AS AND FOR THE SEVENTH CLAIM FOR RELIEF
(Equitable Contribution)

50.    Third-Party Plaintiffs repeat and reallege paragraphs 1 through 49, supra, as if fully set forth herein.

51.    Third-Party Plaintiffs have denied any responsibility or liability whatsoever with respect to the subject matter of the Complaint.

52.    If it should be found that Third-Party Plaintiffs are in some manner liable, then any damages awarded against them were proximately caused or contributed to by the conduct of Third-Party Defendants.

53.    It is necessary that a prorated degree of negligence and/or fault, or other culpable conduct of any defendant be determined and prorated so that Third-Party Plaintiffs will not be required to pay more than their prorated share of any judgment or other award, if any, and to pay only according to the degree of negligence and/or fault attributed to Third-Party Plaintiffs, if any.

### AS AND FOR THE EIGHTH CLAIM FOR RELIEF
(Declaratory Judgment)

54.    Third-Party Plaintiffs repeat and reallege paragraphs 1 through 53, supra, as if

fully set forth herein.

55.    An actual controversy exists between Third-Party Plaintiffs and Third-Party Defendants in that Third-Party Plaintiffs contends that if it is to be liable to Plaintiff, or any other party either in this action or the Israeli Action, Third-Party Defendants are liable to Third-Party Plaintiffs for any such sums, and that in all events Third-Party Defendants are also liable for the payment of Third-Party Plaintiffs' reasonable attorneys' fees and costs incurred in defense of this action and the Israeli Action.

56.    It is anticipated that Third-Party Defendants will deny any such liability.

57.    Third-Party Plaintiffs request a declaratory judgment that Third-Party Defendants are required to pay the costs of defense as incurred by Third-Party Plaintiffs in this action and the Israeli Action, and to further provide for indemnification and/or contribution in connection with any liability that may be adjudged against Third-Party Plaintiffs either in this action or the Israeli Action.

58.    Such a determination is appropriate and necessary in that Third-Party Plaintiffs have no adequate or speedy remedy at law and the request of such a judicial determination will avoid a multiplicity of suits, resulting in judicial economy and furtherance of the interest of justice.

WHEREFORE, Third-Party Plaintiffs request judgment in their favor on their Third-Party Complaint against Third-Party Defendants Burger Holdings and Eldad Ella as follows:

a)    On the First Claim for Relief, judgment against Third-Party Defendant Burger Holdings and in favor of Third-Party Plaintiff Five Towns in an amount to be proven at trial;

11

b)    On the Second Claim for Relief, judgment against Third-Party Defendants Burger Holdings and Mr. Ella in favor of Third-Party Plaintiffs Five Towns and Mr. Krevat in an amount to be proven at trial;

c)    On the Third Claim for Relief, judgment against Third-Party Defendant Burger Holdings in favor of Third-Party Plaintiff Five Towns in an amount to be proven at trial;

d)    On the Fourth Claim for Relief, judgment against Third-Party Defendant Burger Holdings in favor of Third-Party Plaintiff Five Towns in an amount to be proven at trial;

e)    On the Fifth Claim for Relief, judgment against Third-Party Defendants Burger Holdings and Mr. Ella in favor of Third-Party Plaintiffs Five Towns and Mr. Krevat in an amount to be proven at trial;

f)    On the Sixth Claim for Relief, judgment against Third-Party Defendants Burger Holdings and Mr. Ella in favor of Third-Party Plaintiffs Five Towns and Mr. Krevat in an amount to be proven at trial;

g)    On the Seventh Claim for Relief, judgment against Third-Party Defendants Burger Holdings and Mr. Ella in favor of Third-Party Plaintiffs Five Towns and Mr. Krevat for compensatory damages in an amount to be proven at trial;

h)    On the Eighth Claim for Relief, judgment declaring that Third-Party Defendants Burger Holdings and Mr. Ella have a duties of defense, indemnification, contribution and to hold Third-Party Plaintiffs harmless from any and all costs, expenses, or liability in connection with any claim against them, whether asserted in

this action or in the Israeli Action, arising out of the transactions or occurrences

which are the subject matter of this action or the Israeli Action;

    i)      On all Claims, pre-judgment and post-judgment interest as provided by

law;

    j)      On all Claims, costs and attorneys fees incurred in this action; and

    k)      Third-Party Plaintiffs be granted such other and further relief as may be

proper.

Dated: August 4, 2009

                                      Respectfully submitted,

                                        Richard G. Tashjian, Esq.
                                        Gerald Padian, Esq.
                                        Tashjian & Padian
                                        15 West 36th Street, 15th Floor
                                        New York, New York 10018
                                        (212) 319-9800
                                        rtashjian@tashpad.com
                                        gpadian@tashpad.com

To:    PEARL COHEN ZEDEK LATZER, LLP
        Lee Goldberg, Esq.
        Nathaniel B. Buchek, Esq.
        1500 Broadway, 12th Floor
        New York, New York 10036
        (646) 878-0800
        LeeG@pczlaw.com
        NathanB@pczlaw.com
        *Attorneys for Plaintiff*
        *Burger's Bar I.I.D.*

BENJAMIN Z. HOLCZER, P.C.
Benjamin Zev Peter Holczer, Esq.
235 Maple St.
West Hempstead, New York 11552-3203
(516) 565-1433
benzhol@aol.com
*Attorney for Third-Party Defendants Eldad Ella and*
*Burger Holdings Corp. a/k/a Burgers Holding Inc.*

Exhibit A

## BURGERS BAR
## LICENSE AGREEMENT

**THIS LICENSE AGREEMENT** is made and executed as of November ___, 2006 ("Effective Date") by and between Burgers Holding, Inc., a New York limited liability company with its principal place of business at 1906 Coney Island Avenue, Brooklyn NY 11230 ("BB"), on the one hand, Burgers Bar Five Towns, LLC ("Licensee"), a New York limited liability company with its principal place of business at 120 East 87th Street, New York, NY 10128 and Mitchell Krevat ("Krevat"), on the other hand.

### RECITALS:

A. BB has developed a distinctive concept and type of Kosher restaurant featuring American-style food, including Kosher gourmet hamburgers, and related items and beverages under the name "BURGERS BAR" (individually a "Burgers Bar Restaurant" and collectively, the "Burgers Bar Restaurants") and operates a gourmet hamburger restaurant under the name "BURGERS BAR" located at 1906 Coney Island Avenue Brooklyn, NY 11230.

B. BB owns, and has all necessary rights to license to others to use, the various trademarks and service marks employed in Burgers Bar Restaurants (referred to together as the "Marks") and to use the recipes, procedures and other techniques involved in operating a Burgers Bar Restaurant (the "Operating System").

C. Licensee is a limited liability company controlled by Krevat and formed for the purposes of engaging in the business of operating and managing restaurants and Licensee desires to obtain a license to use the Marks and Operating System in the operation of Kosher gourmet hamburger restaurants.

D. BB is willing to grant a license to Licensee upon the terms and conditions set forth herein.

NOW THEREFORE, in consideration of the mutual promises contained in this Agreement, the parties hereby agree as follows:

1.    GRANT OF LICENSE

1.1.    Grant. BB hereby grants Licensee a limited license to use the Marks and the Operating System solely in direct connection with the sale of Kosher food, beverage and other products at the locations identified and mutually agreed upon between BB and Licensee from time to time (the "Restaurants"). The first Restaurant is identified by the parties and specified on Exhibit A-1 attached hereto and incorporated herein by reference.



1.2.    Development and Operation.  Licensee agrees to use its commercially reasonable efforts to open and operate the Restaurant identified in Exhibit A-1 (the "Cedarhurst Restaurant") as soon as reasonably possible after execution of this Agreement.

1.3.    Additional Restaurants. Licensee may add one or more Restaurants to this Agreement by written agreement signed in each case by both Licensee and BB prior to opening of such Restaurant. Licensee may not relocate a Restaurant from any location approved by BB without the prior written consent of BB, which consent will not be unreasonably withheld. Each additional Restaurant shall be added to Exhibit A-1 as and when agreed to by the parties and acknowledged in writing. The Restaurants will be opened and operated by Licensee which will contain the trade images, trade signage, trade fixtures and trade furnishings bearing the Marks ("Signage"), menu items, equipment, personnel, point of sale systems and other aspects of BURGERS BAR operations as BB and Licensee may agree upon as to each Restaurant.

1.4.    Protected Territory; Right of First Refusal.

(a)    During the term of this Agreement, BB shall not, directly or indirectly, own, operate or grant any franchise or license to own or operate a BURGERS BAR Restaurant within the Protected Territory around a Restaurant. For purposes of this Agreement, "Protected Territory" shall mean the area known as the "Five Towns" including the Village of Cedarhurst, New York with respect to the Cedarhurst Restaurant, or a five-mile radius of any other Restaurant of Licensee or Krevat.

(b)    **Option and Right of First Refusal.**

(i)    If at any time during the term of this Agreement, BB desires to grant any franchise or license to a third party for the use, operation or ownership of a Burgers Bar Restaurant or any other restaurant incorporating the Marks and/or Operating System in any area within the United States, subject to Section 1.4(b)(iii) below, BB shall, within twenty (20) days, notify Krevat in writing and shall offer (the "Offer") Krevat the first right and option (the "Option") to open a Restaurant in such area.  The Offer shall include a copy of any proposed agreement between BB and such third party and any other pertinent information pertaining to the proposed Burgers Bar Restaurant, including without limitation, the location in the area, if known, the terms of any lease, any build-out requirements to open and operate the Burgers Bar Restaurant in such area and the cost thereof and any start-up fees payable to BB in connection with such Offer.  Krevat shall have thirty (30) days (the "Option Period") from the date of receipt of the Offer to exercise the Option on the terms of the Offer in writing. During such thirty (30) day period, BB shall not enter into any agreement or understanding with any third party for the ownership, operation, franchise or license of the Burgers Bar Restaurant in such area or any other restaurant incorporating the Marks and/or Operating System in such area. If Krevat exercises his Option within the Option Period, the parties shall promptly enter into a license agreement upon substantially the same terms and conditions as set forth in this License Agreement, incorporating the terms of the Offer,

E.E  M

and include in Exhibit A-1 such area, or the specific location, if known, of the new Restaurant. If Krevat does not exercise his Option during the Option Period, the area contemplated in the Offer will no longer be deemed subject to the Option and BB shall be free to own, operate or grant a franchise or license to a third party franchisee to own or operate a Burgers Bar Restaurant in the same area that was identified in the Offer upon the same terms and conditions set forth in the Offer to Krevat or upon such other terms and conditions that, when taken as a whole, are no more favorable than were last offered by BB to Krevat or that are set forth in this Agreement.

(ii)    Notwithstanding anything contained in Section 1.4(b)(i) to the contrary, the Option shall not apply to any Burgers Bar Restaurant opened after the date hereof that is owned by BB (or an affiliate of BB) so long as Eldad Ella maintains a Controlling Interest in BB (or such affiliate of BB); provided, however, that, if, at anytime, BB or such affiliate of BB desires to grant any franchise or license to a third party for the use, operation or ownership of such Burgers Bar Restaurant, BB or such affiliate of BB, as the case may be, the provisions of this Section  1.4(b)(i) shall recommence and BB or such affiliate of BB shall submit the Offer to Krevat. For the purposes of this Section, the granting of a franchise or license shall include a sale or transfer that would result in the loss of a Controlling Interest in such Burgers Bar Restaurant.  A "Controlling Interest" shall mean a ninety (90%) percent or greater ownership and/or equity interest held by Eldad Ella in such entity and the power to vote the majority of an entity's entire outstanding capital stock or other controlling interest in such entity belonging to, being owned and controlled by and being fully vested in Eldad Ella, the person executing this Agreement.

(iii)    Krevat expressly acknowledges and agrees that BB intends to own, operate or grant a license to own or operate a Burgers Bar Restaurant in the Washington Heights Area (as defined below) and that BB is under no obligation to Offer to Krevat any Option to own or operate a Burgers Bar Restaurant in the Washington Heights Area and the Option expressly excludes any right of first refusal that may prevent the development and/or operation of a Burgers Bar Restaurant in the Washington Heights Area by BB or any third party Krevat or franchisee and.  For the purposes of this Agreement, the "Washington Heights Area" means the radius area within fifteen existing city blocks of 500 West 185th Street, New York, New York 10033.

2.    TERM.  This Agreement will be effective as of the Effective Date set forth above and will continue until terminated as to all of the Restaurants pursuant to Section 12 below (the "Term").

3.    RESTAURANT SYSTEM AND PROCEDURES

3.1.    Openings.  BB will advise and assist Licensee in opening and operating each Restaurant, including attendance by and providing the personal services of Eldad Ella ("Eldad") or, if Eldad is unavailable, another BB officer acceptable to Licensee, at each of the Restaurant openings. BB representatives will assist Licensee in coordinating the pre-opening activities for each Restaurant and will be available to assist with its

E. E

operations for up to five (5) days during the opening week or as reasonably requested by Licensee and for up to two (2) days during each week or as reasonably requested by Licensee during the three (3) month period following the opening of such Restaurant. Licensee agrees to reimburse BB promptly following invoice for all of their reasonable travel, lodging and other costs incurred in connection with living expenses in providing this in-store training and assistance for each Restaurant opening. Licensee will carry out an advertising program designed for the opening of each Restaurant, as mutually agreed upon between Licensee and BB.

    3.2.    Operation.

        (a)    Licensee agrees that it will identify and appoint an individual who will be its representative in managing the Restaurants (the "Representative"). Licensee may change to another Representative from time to time following written notice to BB.

        (b)    Licensee hereby authorizes and appoints the Representative with full authority to act on behalf of Licensee in regard to performing or administering this Agreement. BB may deal completely with the Representative in such regard unless and until its actual receipt of written notice from Licensee of cancellation of such authority. Licensee hereby appoints Mitchell Krevat as Licensee's Representative as of the date hereof.

        (c)    Licensee agrees that it will operate each Restaurant in accordance with the BURGERS BAR standards of high quality and friendly service which will at no time be less than the same degree of high quality and friendly service, recognizing that an integral part of the Operating System includes friendly treatment of customers. Without limitation, Licensee specifically agrees to comply with all health, safety and other laws applicable to the operation of each Restaurant.

        (d)    Notwithstanding anything contained herein to the contrary, the parties shall jointly determine the methods of *kashrus* with respect to ingredients, equipment, and process, subject to the final approval of the prevalent local authority.

    3.3.    Confidentiality.

        (a)    Licensee agrees that BB is the owner of all rights in and to the Operating System, and that the Operating System contains trade secrets and themselves constitute trade secrets of BB which have been or will be revealed to Licensee in confidence. Licensee agrees not to disclose, duplicate, license, sell or reveal any portion thereof to any other person, except an employee of Licensee required by his or her work to be familiar with such information. Licensee agrees to keep and respect all confidential information received from BB.

        (b)    Licensee will pursuant to this Agreement disclose to BB confidential, proprietary and trade secret information regarding Licensee. BB agrees that it will keep and respect all confidential information received from Licensee and will not

disclose, duplicate, license, sell or reveal any portion thereof to any person, except any employee of BB required by his or her work to be familiar with such information.

3.4.    Covenants. Licensee agree that during the term of this Agreement and any extension, Licensee will not (i) use the Marks, trade dress, recipes and other proprietary parts of the Operating System without the prior express written consent of BB; and (ii) do any act which Licensee knows would be injurious or prejudicial to the goodwill associated with the BURGERS BAR chain, the Operating System or the value of the Marks..

3.5.    Employees. The parties each hereby agree that such party will not knowingly recruit and hire any person employed by the other party or by any other BURGERS BAR franchisee without first obtaining such other party's written consent. The parties agree that in the event of a breach of this covenant, actual damages would be extremely difficult to compute, and accordingly, in the event of such a breach, the breaching party agrees to pay the prior employer of such person liquidated damages equal to the greater of (a) such person a prior annual salary or (b) the annual salary and any bonus and other benefits paid or to be paid by the breaching party to such person during the first year of employment.

3.6.    Purchase of Supplies and Proprietary Ingredients.

(a)    Purchase of Supplies. Licensee agrees to purchase all products for sale at the Restaurant, product packaging and other non-perishable supplies (the "Supplies") solely from BB. If BB is unable to supply the Supplies, Licensee, Licensee may propose an alternative supply in writing to BB and instruct the proposed supplier to contact BB and follow BB's procedures for becoming an approved BURGERS BAR supplier. BB agrees not to unreasonably withhold its approval and, upon request by Licensee, to expedite the approval process if Licensee demonstrates that it has been unable to purchase sufficient Supplies from BB on a timely basis to meet its needs.

(b)    Proprietary Ingredients. Licensee agrees to buy certain proprietary ingredients directly from BB or a designated approved supplier (which may be an affiliate of BB). Licensee understands and agrees that such ingredients are prepared pursuant to secret, proprietary recipes and/or procedures belonging to BB or its affiliates.

(c)    BB agrees to supply all Supplies and proprietary ingredients that are purchased by Licensee from BB at BB's actual cost, plus a seven (7%) percent administrative fee. Prices may be adjusted as a result of an increase or decrease in BB's cost of Supplies and/or proprietary ingredients, but not more often than two (2) times per calendar year during the term of this Agreement upon no less than sixty (60) days prior written notice to Licensee (the "Price Adjustment Notice") to reflect increases or decreases in BB's actual costs. BB shall, within sixty (60) days of the Effective Date and thereafter concurrent with the Price Adjustment Notice, provide Licensee with a list of all Supplies that BB is willing to supply to Licensee and BB's actual cost of such supplies.

E.E M

4.    TRAINING

4.1.    Initial Training.  BB will provide such training as is necessary for those persons identified to act as Restaurant managers at its Brooklyn facilities.

4.2.    Assistance.  BB will make available Eldad to the Representative and those persons identified to act as Restaurant managers for the six (6) month period following the opening of the first Restaurant, at least two times per week to assist the Representative and those persons identified to act as Restaurant managers in the Operating Systems, including food preparation, and provide advice and additional training.  Thereafter, BB shall provide such on-site assistance and advice as reasonably requested from to time by Licensee.

5.    MAINTENANCE.  Licensee agrees to maintain each Restaurant and other portions of each Restaurant consistent with BB's own high quality and service standards as applicable to all of BB's restaurants and as consistently applied to other licensees.

6.    FEES; RECORDS

6.1.    Fees.  As partial consideration for the rights granted by BB, Licensee will pay BB:

(a)    Except as provided in Section 1.4(b)(i) and excluding the Cedarhurst Restaurant, for each of the first twenty additional Restaurants opened by Licensee, an initial fee for each such Restaurant in the total amount of $70,000.00 (the "License Fee") due upon the opening of such Restaurant for business to the public; and

(b)    a royalty (the "Royalty") equal to five percent (5%) of Gross Sales (as defined below) as payment (the "Royalty Payment") to BB for the continuing right to use the BURGERS BAR Operating System and Marks; provided, however, that no Royalty shall be due or payable to BB with respect to any Restaurant (including Restaurants that were opened pursuant to Krevat's Right of First Refusal pursuant to Section 1.4(b)(i)) on Gross Sales made during the first ninety (90) days after the date any such Restaurant is opened for business by Licensee to the public. 120 ML

6.2.    Acquisition Costs.  In addition to the Licensee Fee and Royalty, Licensee will be responsible for the actual costs for the construction and preparation of the Restaurant at each Restaurant site.  Licensee shall be responsible for completion of the construction and delivery of the Restaurant site in a fully operational state, including, without limitation, all equipment (including, without limitation, refrigerators, freezers, fryers, and registers) and furnishings (including, without limitation, chairs and tables for customers), required so that it may be immediately open for business.  BB shall have the right to oversee and supervise the construction and approve the final Restaurant design, such approval not to be unreasonably withheld, conditioned or delayed.

E.E ML

6.3.    Payment of Fees.  Licensee agrees to pay BB the Royalty Payments provided for above monthly in lump sum so that BB will receive all such Royalty Payments within forty-five (45) calendar days after the end each calendar month. Each payment shall be accompanied by a Sales Report (as defined below) so that BB may maintain current information regarding sales information.

6.4.    Gross Sales. The term "Gross Sales" as used in this Agreement will mean the total of all cash or other form of payment ("Receipts") received by Licensee for the sale of BURGERS BAR food, beverages and other products, including promotional items or for catering services involving BURGERS BAR products. Neither Gross Sales nor Receipts shall include (a) any sums collected and paid out for sales taxes levied on the sale of food, beverages, property or services, (b) the proceeds from the sale of a Restaurant's used equipment, (c) meals provided to Licensee employees according to established Licensee policies, (d) sales for which refunds are made due to customer dissatisfaction; and (e) any discounts or coupons offered in connection with any Co-Op Advertising program, which are applied against the full sales price.

6.5.    Records. Licensee will maintain and preserve for a minimum of three (3) years from the date of preparation full, complete and accurate books, records and accounts covering all of the Restaurants operated by Licensee. BB and Licensee will from time to time as necessary work together in good faith and agree upon the use by Licensee of the appropriate electronic cash registers, computer programs, bookkeeping and record keeping forms.

6.6.    Sales Reports.  Licensee agrees to provide BB with each Royalty Payment a report of all sales made at each Restaurant in the immediately preceding calendar month, using such forms as are mutually agreed upon between Licensee and BB ("Sales Reports").

7.    AUDITS AND INSPECTIONS

7.1.    Audit Rights. Licensee agrees that BB will have the following audit rights at all times during the term of this Agreement and for a period of one (1) year following the expiration or earlier termination of this Agreement:

(a)    An independent accounting firm mutually acceptable to each of BB and Licensee may, not more often than twice in any calendar year and upon reasonable prior written notice to Licensee, review and inspect the accounting records and other books and records of Licensee as may be reasonably necessary to determine Licensee's Gross Sales at the Restaurants.

(b)    If any such inspection or audit reveals that the Gross Sales reported in any report or statement are less then the actual Gross Sales calculated during such inspection, then Licensee will immediately pay BB the additional amount of fees owing by reason of the understatement of Gross sales previously reported.



8.    MARKETING AND ADVERTISING

8.1.    Marketing, Promotion and Advertising Programs. Recognizing the value of marketing, advertising and promotions to enhance the goodwill and public image of the BURGERS BAR chain of restaurants, the parties agree that BB will develop marketing, promotion and advertising programs designed to promote and enhance the collective success of all Burgers Bar Restaurants, including the Restaurants established by Licensee hereunder. In furtherance of the foregoing, BB agrees to initially retain Krevat's affiliate, Mktg.ny (the "Advertising Agent") as the exclusive advertising agency for BB, BURGERS BAR, the Burgers Bar Restaurants, the Operating Systems, Marks and BB. BB and Mktg.ny shall execute an Advertising Agency Agreement in connection with the services Mktg.ny is to perform as Advertising Agent, which Advertising Agency Agreement shall provide, among other things, that it is terminable by either party upon thirty (30) days written notice to the other party. It is expressly agreed that in all respects of such marketing, promotion and advertising (such as type, quantity, timing, placement and choice of media, market areas and advertising agencies), the decisions of BB will be made in good faith and in consultation with Licensee and Mktg.ny for so long as Mktg.ny acts as Advertising Agent. In regard to all advertising and sales promotion programs, both parties agree to cooperate with each other and refrain from any action which the other party may deem to be harmful to its image.

8.2.    Advertising. BB hereby represents to Licensee that it shall spend, and shall require of each licensee or franchisee of a Burgers Bar Restaurant to contribute to BB, on a quarterly or more frequent basis, a minimum dollar amount equal to one percent (1%) of its aggregate Gross Sales ("Advertising Contributions") from its Restaurants for the purpose of BB conducting direct advertising and sales promotion programs for the Burgers Bar Restaurants in accordance with the advertising and sales promotion programs established by BB from time to time. Each license or franchise agreement between BB and any third party licensee or franchisee for the ownership or operation of a Burgers Bar Restaurant shall require such Advertising Contributions a requirement that such licensee or franchisee contribute to BB, on a quarterly or more frequent basis. BB agrees to use the Advertising Contributions for the sole purpose of marketing, advertising, promoting and branding the Burgers Bar Restaurants.

9.    INDEMNIFICATION

9.1.    Indemnification by Licensee. Licensee will indemnify, defend and hold BB and its or their officers, directors, employees, agents, affiliates, successors and assigns harmless from and against (i) any and all claims based upon, arising out of or in any way related to the operation or condition of any part of the Restaurants or Restaurants' premises, the conduct of the Restaurants, businesses, the ownership or possession of real or personal property, any negligent act, misfeasance or nonfeasance by Licensee or any of its agents, contractors, servants or employees, and including, without limitation, all obligations of Licensee incurred pursuant to any provisions of this Agreement; and (ii) any and all fees (including reasonable attorneys' fees), costs and



other expenses incurred by or on behalf of BB in the investigation of or defense against any and all such claims.

9.2.    BB will indemnify, defend and hold Licensee and its or their officers, directors, employees, agents, affiliates, successors and assigns harmless from and against any and all claims based upon, arising out of or in a any way related to (i) claims that the operation of any Restaurant violates territorial exclusivity granted to a BURGERS BAR licensee, franchisee, or developer by BB, (ii) claims that the operation of any Restaurant breaches an express or implied contractual obligation owed by BB to any BURGERS BAR licensee, franchisee, or developer, (iii) claims that the operation of any Restaurant constitutes tortious conduct against any such BURGERS BAR licensee, franchisee, or developer, (iv) claims that the Marks or Operating Systems infringes, misappropriates or otherwise constitutes the unauthorized use of any third party patent, copyright, trademark, trade secret or other proprietary or intellectual property right; and (v) any and all fees (including reasonable attorneys' fees), costs and other expenses incurred by or on behalf of Licensee in the investigation of or defense against any and all such claims.

10.    INSURANCE

10.1.    Licensee's Insurance.  Licensee agrees to maintain at all times adequate insurance regarding the operation of each Restaurant consistent with its general policy regarding insurance at all of its restaurants. Such policy may include self-insurance so long as it is adequate to ensure continued operation of the Restaurants. Licensee will take such action as is necessary to cause BB to be named as additional insureds in all liability policies covering the Restaurant so that Licensee and BB will at all times be protected against any and all loss, liability or occurrence, arising out of or in connection with the construction, condition, operation, use or occupancy of the Restaurants or the Restaurants' premises. In all events the insurance policy or policies will include (a) comprehensive general liability insurance in an amount sufficient to satisfy the requirements of the umbrella liability insurance policy required below, (b) liquor liability coverage (if any alcoholic beverages are offered for sale from the Restaurant), (c) umbrella liability insurance providing a minimum of $1,000,000 additional coverage, and (d) workers, compensation insurance as required by applicable law. Licensee's obligation to maintain such insurance will not be limited in any way by reason of any insurance maintained by BB.

10.2.    BB shall maintain at all times during the term of this Agreement and for a period of one (1) year following the expiration or earlier termination of this Agreement, at its sole cost and expense, commercial general liability insurance policies, including but not limited to coverage for (i) injury to persons, (ii) damage to property, (iii) contractual liability, (iv) personal and advertising injury liability, in an amount of not less than two million dollars ($2,000,000) for each occurrence.

10.3.    Certificates. Upon obtaining the insurance required by this Agreement and on each policy renewal date thereafter, the party required to obtain such insurance will deliver to the other party certificates of insurance showing compliance with the



requirements of this Section 10. Such certificates must state that the policy or policies will not be canceled or altered without at least thirty (30) days, prior written notice to the other party. Maintenance of such insurance and the performance by each party of its obligations under this Section 10 will not relieve such party of its indemnification obligations under Section 9 of this Agreement or limit the liability of such party.

## 11.    TRADEMARKS

11.1.    Ownership. BB hereby represents and warrants to Licensee that BB has the sole and exclusive right to use the Marks in connection with the products and services to which they are or may be applied by Licensee hereunder. BB covenants to obtain and maintain registration of the Marks currently used in connection with the Burgers Bar Restaurants and to use its best efforts to obtain registration of any Marks used at any time in the future and approved by BB for use in connection with the Burgers Bar Restaurants. Licensee represents, warrants and agrees that neither during the term of this Agreement nor after its expiration or other termination will Licensee directly or indirectly contest or aid in contesting the validity, ownership or use of the Marks by BB or take any action whatsoever in derogation of the rights claimed therein by BB.

11.2.    Goodwill. Nothing contained in this Agreement will be construed to vest in Licensee any right, title or interest in or to the Marks, the goodwill now or hereafter associated therewith or any right in the design of any Restaurant, other than the rights and license expressly granted herein during the term hereof. Any and all goodwill associated with or identified by the Marks will inure directly and exclusively to the benefit of BB, including without limitation any goodwill resulting from operation and promotion of the Restaurants.

11.3.    Use of Marks. Licensee will not use the Marks in connection with any statement or material which may, in the reasonable business judgment of BB, be in bad taste or inconsistent with BB's public image, or tend to bring disparagement, ridicule or scorn upon BB, the Marks or the goodwill associated therewith.

11.4.    Changes in Marks; Protection. BB will have the right at any time and from time to time upon notice to Licensee to make additions to, deletions from, and changes in the Marks, or any of them, all of which additions, deletions and changes will be as effective as if they were incorporated in this Agreement. All such additions, deletions and changes will be made in good faith, on a reasonable basis and with a view toward the overall best interest of the Burgers Bar Restaurants. BB will protect and preserve the integrity and validity of the marks by taking the actions deemed by BB in its discretion to be appropriate in the event of any apparent infringement of the Marks.

11.5.    Infringements. Licensee will notify BB promptly of any claims or charges of trademark infringement against BB or Licensee, as well as any information Licensee may have of any suspected infringement of the Marks. Licensee will take no action with regard to such matters without the prior written approval of BB and will cooperate in a manner expressly approved by BB.



12.    EXPIRATION AND TERMINATION

12.1.    Termination by BB.

(a)    BB will have the right to terminate this Agreement immediately upon written notice to Licensee if a petition in bankruptcy, an arrangement for the benefit of creditors or a petition for reorganization is filed by or against Licensee, or if Licensee will make any assignment for the benefit of creditors, or if a receiver or trustee is appointed for any one of the Restaurants, unless remedied to the satisfaction of BB within sixty (60) days.

(b)    In the event of any material failure by Licensee to make its payment obligations hereunder, BB may terminate this Agreement in full following thirty (30) days written notice to Licensee unless such delinquency has been cured within such thirty (30) day period.

(c)    BB may terminate the right of any Restaurant to operate under this Agreement in the event of any substantial non-monetary default of this Agreement as applied to such Restaurant. Licensee will have the right to cure such default during the period ending sixty (60) days after receipt from BB or its authorized representative of a written notice of default, except that if such default cannot by its nature reasonably be cured within such sixty (60) day period, and so long as Licensee is diligently taking all action reasonably necessary to effect such cure, the cure period will be extended to a reasonable amount of time to effect such cure. If such default has not been cured by the end of the applicable cure period, this Agreement will automatically terminate as to such Restaurant.

12.2.    Termination by Licensee.

(a)    Licensee will have the right to terminate this Agreement immediately upon written notice to BB if Licensee is unable, after negotiations with Landmark Properties, the landlord for the proposed site for the Cedarhurst Restaurant, to secure a lease for the property located at 531 Central Avenue, Cedarhurst, NY 11516.

(b)    Licensee will have the right, at any time, upon ninety (90) days written notice to BB, to notify BB of Licensee's intention to terminate this Agreement in full, or in part as to one or more Restaurants, and to cause the removal of such Restaurant or Restaurants from this Agreement if Licensee determines, in its sole and absolute discretion, that it is no longer economically practicable or feasible to continue to operate such Restaurant or Restaurants; provided, however, that, if Licensee intends to terminate this Agreement only as to one or more Restaurants (but not all Restaurants), then, during such 90-day period, BB shall have the right to supervise and monitor the operations at such Restaurants and, in consultation with Licensee and at BB's sole cost and expense, use commercially reasonable efforts to restore or increase the profitability of such Restaurants by, among other things, increasing the quality of food product and



implementing additional or modifying existing advertising and marketing plans. Licensee shall have the right to withdraw its notice of intention to terminate as to those Restaurants in which Licensee determines, in Licensee's sole and absolute discretion that the profitability has been restored or increased to a level upon which Licensee would be willing to continue the operations of the Restaurant as a Burgers Bar Restaurant.

(c)     Licensee will have the right, at any time, upon thirty (30) days written notice to BB, to terminate this Agreement in full, or in part as to one or more Restaurants, and to cause the removal of such Restaurant or Restaurants from this Agreement if Licensee intends to sell, lease, convey or assign its rights (whether fee or leasehold rights) in and to the Restaurant site to a third party.

(d)     Licensee will have the right to terminate this Agreement immediately upon written notice to BB if a petition in bankruptcy, an arrangement for the benefit of creditors or a petition for reorganization is filed by or against BB, or if BB will make any assignment for the benefit of creditors, or if a receiver or trustee is appointed for any one of the Restaurants, unless remedied to the satisfaction of Licensee within sixty (60) days.

(e)     Licensee may terminate this Agreement, in whole or as to one or more Restaurants operating under this Agreement, in the event (i) of any substantial default of this Agreement is committed by BB which adversely affects Licensee or all or part of the Restaurants owned or operated by Licensee hereunder or (ii) the "Burgers Bar" trademark in the United States is not valid or infringes on the rights of other parties. BB will have the right to cure such default during the period ending sixty (60) days after receipt from Licensee or its authorized representative of a written notice of default, except that if such default cannot by its nature reasonably be cured within such sixty (60) day period, and so long as BB is diligently taking all action reasonably necessary to effect such cure, the cure period will be extended to a reasonable amount of time to effect such cure, not to exceed one hundred twenty (120) days in the aggregate. If such default has not been cured by the end of the applicable cure period, this Agreement will automatically terminate in whole or as to such Restaurants.

12.3.    Requirements Upon Termination.

(a)     Upon the expiration, termination or cancellation for whatever reason of the operation of a Restaurant under this Agreement, Licensee must in regard to each such Restaurant:

(i)     immediately discontinue the use of the marks and the Operating System, including all BURGERS BAR recipes at such Restaurant;

(ii)     unless BB consents to the contrary, remove the Marks from all buildings, signs, fixtures and furnishings that bear the Marks at such Restaurant, eliminate entirely BB's trade dress and alter and paint such Restaurant with a design and color which is basically different from BB's authorized design and painting schemes so



that there will no longer be any indication to the public that the Restaurant was used to sell BURGERS BAR products;

(iii)     return to BB all proprietary information relating to BURGERS BAR Restaurants that is maintained at such Restaurant; and

(iv)     not thereafter use any identifying characteristic that is in any way associated with BURGERS BAR or similar to those associated with BURGERS BAR at such Restaurant site, or operate or do business under any name or in any manner that might tend to give the public the impression that the Restaurant is or was associated with BB and BURGERS BAR.

(b)     Upon the expiration, termination or cancellation for whatever reason of the operation of a Restaurant under this Agreement, BB shall have the option, in BB's sole discretion, to purchase all (but not less than all) Signage owned by Licensee in regard to each such Restaurant being terminated under this Agreement. The purchase price for such Signage shall be Licensee's purchase price depreciated monthly over a 10-year straight line basis, less extraordinary wear and tear and damage (the "Purchase Price"). Within fifteen (15) days of the expiration, termination or cancellation of the operation of such Restaurant, Licensee, upon BB's written request, shall provide BB with a list of the Signage used at the Restaurant site, along with copies of any vendor invoices evidencing the purchase price of such Signage, to the extent not previously provided to BB or purchased directly from BB. BB shall have the right to conduct an inspection within ten (10) days of receipt of such list from Licensee. Within fifteen (15) days of receiving such list, but in any event no later than thirty (30) days prior to the expiration of any leasehold interest Licensee may have at the Restaurant site, BB shall notify Licensee in writing whether BB desires to purchase the Signage. If BB timely notifies Licensee in writing of its election to purchase all of the Signage, BB shall promptly pay Licensee the Purchase Price and Licensee shall arrange for the removal of the Signage from the Restaurant site for pick-up by BB. Subject to receipt of payment of the Purchase Price in full for such Signage, Licensee agrees to do all things reasonably necessary to place BB in full ownership of the Signage, free of all liens and encumbrances. Licensee shall be solely responsible, at Licensee's cost, for removal of any Signage affixed to the Restaurant site. All Signage shall be made available to BB for pick-up by BB, at BB's cost, at the Restaurant site promptly after receipt of payment.

12.4.   Survival.   The following provisions shall survive the expiration or termination in full of this Agreement: Sections 3.3, 6.3, 6.4, 6.5, 7, 9, 12 and Section 13.

13.     MISCELLANEOUS

13.1. · No Effect. The waiver by either party of any breach or default, or series of breaches or defaults, of any term, covenant or condition herein or of any same or similar term, covenant or condition in any other agreement between BB and Licensee will not be deemed a waiver of any subsequent or continuing breach or default of the same or any



other terms, covenants or conditions contained in this Agreement, or in any other agreement between BB and Licensee.

13.2.    Right and Remedies. All rights and remedies of a party will be cumulative and not alternative, in addition to and not exclusive of any other rights or remedies provided for herein or which may be available at law or in equity in case of any breach, failure or default or threatened breach, failure or default of any term, provision or condition of this Agreement. All rights and remedies will be continuing and not exhausted by any one or more uses thereof and may be exercised at any time or from time to time as often as may be expedient Any option or election to enforce any such right or remedy may be exercised or taken at any time and from time to time.

13.3.    Consents. Whenever the consent of a party is sought or required hereunder, such consent will not be unreasonably withheld.

13.4.    Partial Invalidity. If any part of this Agreement will for any reason be declared invalid, unenforceable or impaired in any way, the validity of the remaining portions will not be affected thereby, and such remaining portions will remain in full force and effect as if this Agreement had been executed with such invalid portion eliminated. it is hereby declared the intention of the parties that they would have executed the remaining portion of this Agreement without including therein any such portions which might be declared invalid.

13.5.    Governing Law. The parties agree that the law of the State of New York, will apply to the construction and enforcement of this Agreement and govern all questions which arise with reference hereto, without giving effect to its conflict of laws principles.

13.6.    Notices. All notices and other communications required or permitted to be given hereunder will be deemed given when delivered in person, sent by telefax to such person's telefax number, sent by an established overnight delivery service or mailed by registered or certified mail addressed to the recipient at the address set forth below, unless that party will have given such written notice of change of address to the sending party, in which event the new address so specified will be used. All notices shall be deemed to have been given when received.

If to BB:

Burgers Holding Inc.
1906 Coney Island Avenue
Brooklyn NY 11230
Attention: Eldad Ella

With a copy to:

Rosenfeld & Maidenbaum

132 Spruce Street
Cedarhurst, New York 11516
Attention: Meir Rosenfeld

If to Licensee:

Burgers Bar Five Towns, LLC
120 East 87th Street
New York, NY 10128
Attention: Mitchell Krevat

With a copy to:

Cohen Tauber Spievack & Wagner, LLP
420 Lexington Avenue, Suite 2400
New York, New York 10170
Attention: Jay Spievack, Esq.

13.7.   Terms and Headings. All terms used in this Agreement regardless of the number and gender in which they are used, will be deemed and construed to include any other number, singular or plural, and any other gender, masculine, feminine or neuter, as the context or sense of this Agreement may require, the same as if such words had been written in this Agreement themselves. The headings inserted in this Agreement are for reference purposes only and will not affect the construction of this Agreement or limit the generality of any of its provisions.

13.8.   Entire Agreement. This Agreement and the documents referred to herein constitute the entire agreement between the parties and supersede and cancel any and all prior and contemporaneous agreements, understandings, representations, inducements and statements, oral or written, of the parties in connection with the subject matter hereof.

13.9.   Amendment or Modification. Except as expressly authorized herein, no amendment or modification of this Agreement will be binding unless executed in writing by both BB and Licensee.

13.10.  Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original of this Agreement, but all of which together shall constitute one and the same instrument.

13.11.  Facsimile Signatures. The parties agree that signed copies of this Agreement sent to the other parties by telefax or other facsimile transmission will be considered binding on such signing party the same as if delivered personally. Each party will thereafter send to each of the other parties an originally signed copy of this Agreement for such party's records.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first above written.

**LICENSOR:**
**Burgers Holding, Inc.**

By: _____

Name _____Eldad Ella_____

Title: ____President____

**LICENSEE:**
**Burgers Bar Five Towns, LLC**

By: _____

Name: ____Mitchell Keevot____

Title: ____President____

Exhibit B

